## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **JUDY MAYES JACK,** | § | **CASE NO. 07-32747** |
| | § | |
| *Debtor* | § | **Chapter 13** |
| | § | |
| _____ | § | _____ |
| | § | |
| **SETTLEMENT CAPITAL** | § | |
| **CORPORATION** | § | **ADVERSARY NO. 07-3341** |
| | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **ALLSTATE LIFE INSURANCE** | § | |
| **COMPANY, ALLSTATE** | § | |
| **SETTLEMENT CORPORATION,** | § | |
| **TERESA SCARDINO** *as* | § | |
| *Administrator of the Estate of Samuel* | § | |
| *Jack, Jr.*, **ROGER PHILLIPS** *as the* | § | |
| *Trustee of the Samuel Jack 1996 Trust,* | § | |
| **VIOLET JACK individually and on** | § | |
| **behalf of Shalynthia Denise Jack and** | | |
| **Adrian Dwain Jack, and JUDY** | | |
| **MAYES JACK** | | |
| | | |
| *Defendants* | | |

## MEMORANDUM OPINION

### I.      Introduction

Samuel Jack, Jr. (Samuel Jack) incurred a serious head injury during the course of his

employment as a longshoreman in the mid-1980s.   As part of the structured settlement with his

employer, Samuel Jack was made the beneficiary of an annuity with the right to receive payments

vested through the year 2012.   Prior to his death, Samuel Jack conveyed his right to receive all future

monthly payments under the annuity to Settlement Capital Corporation (SCC) in exchange for an immediate lump sum cash payment.   There are future payments of approximately $90,000.00 remaining under the annuity.

Judy Mayes Jack (Judy Jack), Samuel Jack's widow, alleges that: (1) Samuel Jack lacked the mental capacity to enter into the series of contracts which assigned his interest to SCC; and (2)  the original settlement agreement contained an anti-alienation clause, which precluded Samuel Jack from effectuating a transfer of any interest to SCC.   Thus, she asks this Court to declare that the transactions with SCC are void or voidable and the remaining funds are property of her Chapter 13 estate.  Violet Jack, an ex-wife of Samuel Jack, claims that she is entitled to the remaining payments because she holds a valid child support lien which is superior to the rights of Judy Jack as Samuel Jack's heir.  Finally, SCC claims that the transactions with Samuel Jack are valid and it owns the right to receive all remaining payments under the annuity.[1] During a three-day trial, the Court heard testimony from ten witnesses and admitted exhibits from SCC, Violet Jack, and Judy Jack.

After considering the testimony, exhibits, and arguments of counsel, the Court concludes that SCC is the owner of the annuity payments because (1) Samuel Jack had the mental capacity to enter into the transactions conveying his rights to SCC; and (2) he waived the protection of the anti-alienation clause.

---

[1] The other named defendants are no longer parties to this dispute.  After the pre-trial conference and before trial, all claims against the administrator of Samuel Jack's estate and the trustee of the Samuel Jack 1996 trust were withdrawn.  Additionally, the Court granted directed verdict in favor of Allstate Life Insurance Company and Allstate Settlement Corporation at the conclusion of Judy Jack's case in chief.  Allstate Life Insurance Company is holding the subject funds pending the outcome of this adversary proceeding.

II.     **Findings of Fact**

    A.     **Samuel Jack's accident and the settlement of his claims**

On June 25, 1986, Samuel Jack sustained a significant injury to the right side of his head while working as a longshoreman.  Shortly thereafter, Samuel Jack filed a personal injury lawsuit against his employer, Southern Pacific Transportation Company (Southern Pacific).  On June 15, 1992, the personal injury lawsuit was settled (the Settlement Agreement).  [SCC Ex. 3.]  The Settlement Agreement required Southern Pacific to pay Samuel Jack a lump sum of $375,000.00 and make future monthly payments of $1,472.63 from July 1, 1992 until June 1, 2012, and continuing each month thereafter for the rest of his natural life.  [*Id.* at pp. 2-3.]  The Settlement Agreement was signed by Samuel Jack and Diane Dillard, his state court appointed guardian ad litem.  [*Id.* at p. 7.]  The Settlement Agreement states, "I acknowledge that the periodic payments cannot be accelerated, deferred, increased or decreased by me or any payee; nor shall I or any payee have the power to sell, mortgage, encumber, or anticipate the periodic payments, or any part thereof, by assignment or otherwise."  [*Id.* at p. 4.]

On October 19, 1992, Southern Pacific assigned its obligations to make the monthly payments under the Settlement Agreement to Allstate Settlement Corporation, and Allstate Life Insurance Company issued an annuity policy which funded this obligation (the Annuity Contract).  [SCC Ex. 5.]  The Annuity Contract states that the "[p]ayments may not be anticipated, assigned, or pledged as collateral.  Payment dates and amounts may not be changed, either to provide for earlier payment or longer deferral.  The contract has no cash surrender or policy loan value.  So far as the law allows, all payments to any person named by [Allstate Settlement] to receive them are

exempt from that person's creditors, debts, and contracts, and from seizure or attachment by court order or other legal process." [*Id.* at p. 4.]

**B.      Samuel Jack's transactions with SCC**

In 1995, Samuel Jack was charged with driving under the influence of alcohol (DUI).  By this time, approximately three years after he entered into the Settlement Agreement, Samuel Jack had dissipated the original lump sum payment received from Southern Pacific.  The monthly payments that Samuel Jack received under the annuity were insufficient to pay for the legal defense against the DUI charge.  Samuel Jack contacted Allstate Life Insurance Company in search of a way to convert his future stream of payments into present funds.  Thomas Jahncke, an employee of Allstate Life Insurance Company, told Samuel Jack that he had a "friend" who assisted people in such a position.  Mr. Jahncke referred Samuel Jack to James Lokey, the founder, CEO, and president of SCC.

Subsequent discussions between SCC and Samuel Jack led to the execution of a Purchase and Sale Agreement (the First PSA) on November 8, 1995.  [SCC Ex. 4.]  In exchange for an immediate cash payment of $40,000.00, Samuel Jack agreed to "sell, transfer, convey and deliver" to SCC $883.58 out of the total monthly payments of $1,472.63 due to him under the Annuity Contract for a ten-year period from December 1, 1995 to November 30, 2005.  The First PSA clearly states that it was intended to be a purchase and not a loan.  [*Id.* at § 4.12.] In conjunction with the First PSA, SCC required Judy Jack—who was married to Samuel Jack at this time—to execute an Affidavit of Spousal Consent stating that she transferred any possible interest or right she had in the annuity payments to SCC.  [SCC Ex. 14.]

On January 5, 1996, SCC and Samuel Jack entered into a second Purchase and Sale Agreement (the Second PSA).  [SCC Ex. 16.]  In exchange for an immediate cash payment of

$5,000.00, Samuel Jack sold SCC the right to receive an additional $250.00 of the monthly annuity payment for a three-year period starting February 1, 1996 and ending on January 1, 1999. Other than the time period and amount of funds transferred, the Second PSA is identical to the First PSA. On January 2, 1996, Judy Jack signed a second Affidavit of Spousal Consent which was identical to the one she had previously signed. [SCC Ex. 29.]

On February 9, 1996, SCC and Samuel Jack entered into a third Purchase and Sale Agreement (the Third PSA). [SCC Ex. 18.] Under the terms of the Third PSA, SCC purchased the right to receive an additional $325.05 of the monthly annuity payments for the period between March 1, 1996 and January 31, 1999. The Third PSA does not state the amount of consideration received by Samuel Jack for this conveyance, but SCC stipulated that the amount of cash paid was $16,550.00.

On October 28, 1996, SCC and Samuel Jack signed an Amendment to Purchase and Sale Agreements (the Amendment). [SCC Ex. 19.] In the Amendment, Samuel Jack agreed to the creation of the Samuel Jack 1996 Trust, which became the payee of the Annuity Contract. Samuel Jack further agreed to sell, transfer, assign, and convey to SCC all of his beneficial interest in the Trust. Essentially, the Samuel Jack 1996 Trust operated as a strawman enabling SCC to receive the payments due under the Annuity Contract without Samuel Jack making an actual assignment to SCC of any right under the Annuity Contract or the Settlement Agreement. The separate consideration paid by SCC for executing the Amendment was $22,500.00. The Amendment rescinded each of the previous PSAs. After the execution of the Amendment, Samuel Jack had conveyed to SCC any and all of his rights to receive the monthly Annuity payments.

5

On November 4, 1996, SCC and Samuel Jack executed a fourth and final Purchase and Sale Agreement (the Fourth PSA). [SCC Ex. 20.] In the Fourth PSA, SCC purports to purchase Samuel Jack's complete beneficial interest for the remainder of the guaranteed period of the Annuity Contract (i.e. until June 30, 2012). SCC paid no separate consideration to Samuel Jack in connection with the Fourth PSA. The Fourth PSA contains a section titled "Waiver of Restrictions," which reads as follows:

> To the extent that any restrictions on the assignability of the Periodic Payments were included in the Settlement Agreement or the Annuity for the benefit of Seller, Seller acknowledges his intent to waive said benefits. Seller acknowledges that all income realized by Seller after Closing upon any investment or use of the Purchase Price, unless excludable under a provision of the [Internal Revenue Code] may be included in the gross income of Seller under the Code and that this transaction may result in an acceleration and increase in the amount of federal and state income taxes required to be paid by Seller. For the benefit of Purchaser, Purchaser's assigns, the Annuity Issuer and on behalf of Seller and Seller's heirs, beneficiaries, executors, administrators, and legal representatives, Seller hereby WAIVES AND RELEASES all rights and benefits of Seller in, to, or under, all such restrictions on assignability, if any.

[SCC Ex. 20, § 6.1 (emphasis in original).]

The Fourth PSA also includes the following language in a section under the heading of "Indemnification":

> Seller acknowledges that the Settlement Agreement or the Annuity, or both, may contain provisions that restrict or purport to restrict the assignability of the Periodic Payments and/or the Beneficial Interest. Seller further acknowledges that Seller has (both for Seller and for Seller's heirs, executors, administrators, representatives, successors and assigns): (i) released Purchaser from (and waived) any claim that the Beneficial Interest was not assignable; (ii) indemnified and agreed to hold Purchaser harmless from (and agreed to defend Purchaser in any subsequent lawsuit with respect to) any claim that the Beneficial Interest was not assignable; and (iii) agreed never to sue Purchaser with respect to the transferability or assignability of the Beneficial Interest. Without in any way limiting the scope or application of any other provision of this Agreement or the other Closing Documents (and in addition to all of the other covenants and agreements of Seller in this Agreement and the other Closing

6

Documents), Seller covenants and agrees to so order and conduct Seller's affairs as to prevent the assertion of any claim that the Beneficial Interest were not assignable.

[SCC Ex. 20, § 8.2.]

Judy Jack executed a document entitled "Spousal Consent" in connection with the Fourth PSA, which was different in form, but similar in content, to the Affidavits of Spousal Consent she had previously signed.  [SCC Ex. 25.]  This document states, in pertinent part:

> The undersigned hereby agrees and consents to Seller's execution and delivery of the Purchase Agreement and all of the Closing Documents, and to the consummation of the transactions contemplated thereby, specifically including, without limitation, the sale and transfer by Seller to Purchase of the Beneficial Interest.

> The undersigned agrees to be subject to the terms and provision of the Purchase Agreement and each of the Closing Documents (as fully as if the undersigned executed and acknowledged each and every one) and hereby waives any and all right, title, and interest of the undersign in, to, or under the Beneficial Interest, specifically including, without limitation, any community property interest.

[SCC. Ex. 25.]

Samuel Jack received a total of $84,050.00 under the four PSAs and the Amendment.  Judy Jack testified, and SCC and Violet Jack stipulated in the joint pre-trial order [Docket No. 291, p. 12], that the funds acquired by Samuel Jack through the transactions with SCC were used to pay for attorney's fees, restitution, and other legal costs incurred in connection with his DUI offense, as well as the purchase of a new vehicle and the payment of general household expenses.

After Samuel Jack's death on November 20, 2004, Allstate ceased making all payments under the Annuity Contract.  Allstate is holding the remaining payments pending the outcome of this adversary proceeding.

### C.      Samuel Jack's medical condition

In June of 1986, while working as a longshoreman, Samuel Jack suffered an organic brain injury after being struck on the right side of his head by an iron bar which knocked him from the forklift he was driving and onto a steel plate. From 1986 until his death in 2004, Samuel Jack was under the regular supervision of several doctors. The majority of his treatment was done by Dr. A. David Axelrad, who testified as Violet Jack's expert witness. Dr. Axelrad's entire medical records relating to Samuel Jack, some 670 pages, were submitted into evidence by Violet Jack and provide the primary source from which he and SCC's expert witness based their opinions.[2] [V. Jack Ex. 16.] Although Samuel Jack's entire medical history is relevant, the Court is specifically focused on his mental capacity during the time period when he entered into the transactions with SCC (i.e. the period between November 8, 1995 and November 4, 1996). *See Estate of Gallad v. Rosenberg*, 630 S.W.2d 294, 298 (Tex. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.) ("Opinions of anger and impulsive, erratic and irrational behavior far removed from the date in question do not raise an issue of incompetency sufficient to defeat the presumption of mental competency.").

Shortly after the accident, Samuel Jack was given a neuropsychological examination which showed that the accident resulted in an organic brain injury in his right hemisphere, thereby causing some loss of brain function. These mental deficits included a loss in cognitive abilities, executive functions, and memory. During his initial evaluation, Dr. Axelrad also diagnosed Samuel Jack with schizoaffective disorder, a mental disorder which affects a person's judgment and ability to reason. This was a pre-existing disorder which was exacerbated by the injuries sustained in the accident.

---

[2] Although the Court refers to Violet Jack's exhibit number 16 as Dr. Axelrad's medical records, this file contains records prepared by several other treating physicians who were partners of Dr. Axelrad and who would occasionally treat Samuel Jack.

Dr. Axelrad testified that Samuel Jack also suffered from alcoholism which worsened his underlying psychological problems. Although his organic brain injury was permanent, Dr. Axelrad testified that over the many years of treatment, he saw occasional improvements in Samuel Jack's mental condition, often as a result of being hospitalized and required to regularly take his medication.

Between the time that he was released after the accident and November 1996 (i.e. when he signed the final PSA), Samuel Jack was voluntarily admitted to psychiatric hospitals 18 separate times. However, only two of these hospitalizations occurred during the 12-month period when the four PSAs were executed. [V. Jack Ex. Nos. 16-13/19-5 and 16-14/19-6.] On December 6, 1995, Samuel Jack arrived at Dr. Axelrad's office for a scheduled visitation in an "acutely intoxicated" state. [V. Jack Ex. 19-5.] Dr. Axelrad's notes from this date describe Samuel Jack as "suffering an exacerbation of his schizoaffective disorder and his mental status exam reveals significant cognitive impairment as a result of his intoxication and his underlying psychiatric disorder." [Id.] Samuel Jack was compliant with Dr. Axelrad's suggestion that he needed to be hospitalized. Samuel Jack's hospitalization records from December 6, 1995 list the following diagnoses: (1) "Major depressive disorder with psychotic features"; (2) "Arthralgia involving the left shoulder and neck with suspected post-traumatic head injury"; and (3) "Substance abuse history with alcohol and Xanax." [V. Jack Ex. 16-13.] These records also detail the severity of Samuel Jack's alcoholism: "At the time of patient's last hospitalization, he was drinking up to 12 cans of beer per day, which did produce significant agitation, depression, paranoid ideation, and nervousness, and marked behavioral discontrol." [Id.]

Regarding his mental capacity at this time, Dr. Axelrad wrote, "the patient's thought processes were disordered, as a result of his intoxication. He did demonstrate significant stream of

thought, which was slowed and significantly indicative of intoxication . . . . Level of consciousness was moderately disordered because of his intoxication. Memory functioning for immediate recall was impaired, because of intoxication . . . . Intellectual functioning was depressed because of intoxication. He was unable to calculate and his judgment and insight were significantly impaired." [*Id.*] The preliminary treatment plan was to enroll Samuel Jack in an alcohol recovery program and continue prescribing him Xanax for the schizoaffective disorder. His discharge records from this hospitalization state that after being placed on a detoxification schedule, he "talked openly facing denial, committing himself to sobriety, and being willing to participate in 12-step activities after discharge. His affect brightened, and he showed no evidence of any continuing difficulty with outbursts or behavioral control problems . . . and he showed no overt evidence of paranoia." [*Id.*]

On October 28, 1996, the date on which he signed the Amendment, Samuel Jack was again hospitalized to address his problems with alcohol through a chemical dependency recovery program. [V. Jack Ex. 16-13.] Dr. Axelrad's mental status examination on this date indicates that Samuel Jack's "thought processes are generally intact [and] there is no evidence of delusions or paranoid ideas of reference." [*Id.*] Further, Dr. Axelrad found that Samuel Jack's intellectual functioning was intact and that he displayed no evidence of memory dysfunction at that time. [*Id.*]

In preparation for trial, Dr. Axelrad drafted a report summarizing his medical records. [V. Jack Ex. 17.] The report states that Samuel Jack had "recurrent episodes of psychotic illness" and "significant cognitive impairment associated with loose association, tangential thinking, and blocking" which existed during the relevant time period. [*Id.*] His ultimate conclusion was that these impairments were so significant that Samuel Jack "lacked the capacity to contract and that he did lack sufficient mind and memory to understand the nature and consequences of his acts in the

10

business he was transacting on the dates of the conveyances." [*Id.*] Dr. Axelrad testified that, if he had been asked this question in 1995 or 1996, he would have provided the same conclusion that Samuel Jack lacked the capacity to contract.

**D.    Violet Jack's child support lien**

Violet Jack was married to Samuel Jack for several years during the 1970s. The marriage resulted in two children, Shalynthia Denise Jack and Adrian Dwain Jack. The couple divorced in 1979 and Samuel Jack was ordered to pay monthly child support of $85.00. Samuel Jack never paid the child support. On June 23, 2004, just five months before Samuel Jack's death, Violet Jack filed a Motion for Confirmation of Child Support Arrearages in the 312th Judicial District of Harris County, Texas to collect the long overdue child support. On June 29, 2004, the attorney for Violet Jack sent a Notice of Child Support Lien to Allstate Life Insurance Company stating that Samuel Jack owed Violet Jack child support arrears of $153,836.16. [V. Jack Ex. 11.] On November 17, 2004, just three days prior to Samuel Jack's death, Violet Jack sent Allstate a Notice of Child Support Levy. [V. Jack Ex. 12.] After Samuel Jack's death, but before ceasing to make all payments on the Annuity Contract, Allstate delivered five monthly annuity payments to Violet Jack totaling $7,363.15.

In addition to her action in the 312th District Court, Violet Jack filed a claim for her child support arrears with Samuel Jack's probate estate. [V. Jack Ex. Nos. 2, 4.] The Probate Court referred the matter to the 312th District Court for determination of the total amount of child support arrearages. On May 18, 2006, the 312th District Court entered an Order on Arrears which sets forth that as of June 22, 2004 Samuel Jack owed child support arrears of $153,836.16 bearing interest at

a rate of six percent (6%) annually. [V. Jack Ex. 1.] The Order on Arrears also awarded attorney's fees to Violet Jack of $14,550.00. [*Id.*]

## III.   Credibility of Witnesses

Over the course of the three-day trial, the Court heard testimony from a total of ten witnesses: (1) James Lokey, the President, CEO, and founder of SCC; (2) Dr. A. David Axelrad, M.D., Samuel Jack's treating physician and the expert witness of Violet Jack; (3) Dr. Robert Borda, Ph.D., the expert witness of SCC; (4) Kathleen McCumber, an attorney and Justice of the Peace whose firm represented Samuel Jack in connection with the DUI charge; (5) Judy Jack, the widow of Samuel Jack; (6) W. Russ Jones, the successor administrator of the probate estate of Samuel Jack; (7) Ronald Bankston, the attorney who represented Samuel Jack in the personal injury lawsuit arising from his head injury; (8) Steven A. Sinkin, one of the attorneys for Violet Jack; (9) Violet Jack, an ex-wife of Samuel Jack; and (10) Matthew Bracy, general counsel of SCC. The majority of testimony came from the competing expert witnesses of Violet Jack and SCC—Drs. Axelrad and Borda.

Dr. Axelrad received an M.D. from the University of Texas Medical Branch at Galveston in 1970. [Violet Jack Ex. 18, p. 2.] He is currently a practicing psychiatrist with specializations in adult psychiatry, neuropsychiatry, pain medicine, psychoanalysis, and forensic psychiatry. [*Id.*] Dr. Axelrad is board certified in general psychiatry, forensic psychiatry, and pain medicine. [*Id.*] Additionally, he is an adjunct professor of law at the University of Houston Law Center, where he teaches a course in forensic medicine. [*Id.*] Finally, and most notably, Dr. Axelrad treated Samuel Jack from the time of his injury in 1986 through his death in 2004, with the exception of a three-year period from 1990 through 1993. During this lengthy course of treatment, Dr. Axelrad had over 100 separate office consultations with Samuel Jack. Dr. Axelrad's complete medical file for Samuel Jack

totaled 670 pages. Thus, Dr. Axelrad was eminently qualified as an expert witness based not only upon his educational and professional background, but also based upon his wealth of personal observations of Samuel Jack. The Court finds that both Dr. Axelrad's testimony at trial and his medical notes are credible.

On behalf of SCC, Dr. Borda testified that, based upon the medical history found in Dr. Axelrad's notes, Samuel Jack did have sufficient mental capacity to enter into the agreements with SCC. Dr. Borda received a bachelor's degree in Psychology from Princeton University in 1963, a doctorate in Neurophysiology from Baylor University, College of Medicine in 1969, and a second doctorate in Clinical Neuropsychology from the University of Houston in 1984. [SCC Ex. 35, p. 2.] He is a licensed psychologist in the State of Texas, and has held numerous research and clinical positions in this field over the past 35 years. Unlike Dr. Axelrad, Dr. Borda never met or treated Samuel Jack. Instead, Dr. Borda was hired by SCC for the purpose of providing an expert opinion based solely upon review of Samuel Jack's medical records. Despite the gross disparity between the two doctors in their level of personal observation of Samuel Jack, the Court finds Dr. Borda to have been an equally credible witness.

Lokey testified about his interactions with Judy and Samuel Jack during the negotiations of the agreements between SCC and Samuel Jack. Lokey stated that he spoke on the phone with the Jacks several times, albeit for very short periods generally less than five minutes, but that he never had a face to face meeting with Samuel Jack. Lokey's testimony provided the Court with a general background of the transaction with the Jacks, but revealed no particularly relevant information regarding the capacity of Samuel Jack. Thus, the Court does not give much weight to the testimony

of Lokey. However, to the limited extent that the Court relies on any of Lokey's testimony, the Court finds him credible.

McCumber gave testimony regarding a letter dated November 1, 1996 which appears on her firm's letterhead and bears her signature. This letter states that she provided independent counsel to Samuel Jack regarding the Fourth PSA. Specifically, she states that she was "satisfied that the Seller [i.e. Samuel Jack] understands the nature and terms of such transaction" and that Samuel Jack entered into the agreement with SCC of "his own free will and volition and is not under any duress or undue influence." [SCC Ex. 30, ¶¶ 3-4.] McCumber testified that she had no independent recollection of drafting this letter or having ever represented Samuel Jack. She did, however, state that her law partner represented Samuel Jack in connection with his DUI charge, and that at least part of Samuel Jack's motivation behind the transaction with SCC was to provide funds to pay her law partner for that representation.

Insofar as SCC attempted to argue that McCumber's letter was evidence of an independent party determining that Samuel Jack was competent to enter the transaction, the Court finds that both McCumber's testimony and letter lack credibility. First, the Court notes that McCumber had no recollection of having ever spoken with or personally met Samuel Jack. She also stated that she had no memory of drafting the letter. Additionally, Samuel Jack and Judy Jack signed the documents related to the subject transaction on October 19, 1996 [SCC Ex. 20], but McCumber's letter, in which she claims to have verified Samuel Jack's ability to understand the transaction, was not written until November 1, 1996.[3] This nearly two-week lapse in time is highly suspect. Further

---

[3] Counsel for SCC argued that it was possible that Samuel Jack first signed the documents, then consulted with McCumber about their contents prior to mailing the documents to SCC. Such a hypothetical seems improbable, but even if it were true, it still undermines the credibility of the letter.

14

doubts about the validity of the statements in the letter are raised by McCumber's clear conflict in stating that she acted as "independent legal counsel" to Samuel Jack in connection with the transaction when the uncontested purpose of the transaction was to provide Samuel Jack with funds to pay McCumber's law partner for legal representation. McCumber is not disinterested in the transaction merely because it was her law partner and not she that provided the representation to Samuel Jack. These facts, combined with McCumber's complete lack of memory of Samuel Jack or any of the events that transpired in 1996, lead this Court to conclude that the letter and McCumber's testimony should be given no weight.

Judy Jack, the widow of Samuel Jack and the debtor in the Chapter 13 case underlying this adversary proceeding, was called as a witness by SCC and also gave narrative testimony as part of her own case in chief. Despite not having the benefit of counsel, Judy Jack handled herself in a professional and composed manner. The Court commends her preparation and thoughtful participation during trial. It was apparent to the Court that Judy Jack had a deep-rooted and sincere love of her late husband despite his mental health issues and volatile behavior. It could not have been easy to spend three days in a courtroom without any representation listening to a recapitulation of her late husband's twenty-year battle with alcoholism and mental illness. The Court finds that Judy Jack's testimony was honest and credible.

Russ Jones, the successor administrator of the probate estate of Samuel Jack, testified briefly on issues unrelated to Samuel Jack's capacity. The Court did not rely on Mr. Jones' testimony in formulating this Opinion. However, to the extent that Jones' testimony does appear in the Court's conclusions, the Court finds Jones to be a credible witness.

15

Ronald Bankston, the attorney who represented Samuel Jack in the lawsuit arising from his injury, testified about his personal observation of Samuel Jack during the relevant time period and about the anti-alienation clause which he included in the Settlement Agreement.  Mr. Bankston appeared voluntarily and was not compensated for his testimony.  Indeed, Mr. Bankston testified despite the fact that Samuel Jack had filed a grievance against him with the State Bar of Texas due to Mr. Bankston's unwillingness to assist with the Annuity Contract.  Mr. Bankston declined to assist Samuel Jack because Mr. Bankston firmly believed that the Annuity Contract was not in Samuel Jack's best interest. Mr. Bankston's demeanor evidenced a clear concern for Samuel Jack's welfare. Indeed, he exhibited the best qualities of any advocate, legal or otherwise: honesty, humility, and compassion.  Accordingly, the Court finds his testimony to be credible.

Steven Sinkin, one of the two attorneys representing Violet Jack, testified solely for the purpose of laying foundation to the admissibility of certain exhibits.  Insofar as the Court admitted those exhibits, the Court finds that Mr. Sinkin was a credible witness.

Violet Jack, an ex-wife of Samuel Jack, testified briefly concerning her child support lien. Much of her testimony is duplicative of the documents admitted into evidence.  To the limited extent that the Court may rely upon her testimony in this Opinion, the Court finds that she was a credible witness.

Finally, Matthew Bracy, the general counsel of SCC, testified about certain procedures at SCC and general practices in the secured settlement purchasing business.  Despite not being employed by SCC during the relevant time period, the Court finds Mr. Bracy to be a knowledgeable and credible witness.

## IV.   Conclusions of Law

### A.   Jurisdiction and Venue

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1).  This dispute is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (K), and (O).  In the underlying Chapter 13 case, Judy Jack listed the remaining payments due under the Annuity Contract as exempt property in her Schedule C.[4]  In addition to this adversary proceeding, SCC also filed an Objection to Debtor's Claim of Exemption in the Chapter 13 case. [Main Case No. 07-32747, Docket No. 31.]  At a November 2, 2007 hearing, the Court consolidated the objection to exemption with this adversary proceeding in order to adjudicate the issues together. Thus, this suit involves the allowance or disallowance of an exemption from property of the estate under 28 U.S.C. § 157(b)(2)(B).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) insofar as it requires the Court to determine whether the remaining funds are property of Judy Jack's bankruptcy estate. *See In re Terry*, 245 B.R. 422, 423-26 (Bankr. N.D. Ga. 2000).  Should Judy Jack succeed and establish that she, rather than SCC or Violet Jack, owns the superior interest in the remaining payments as the heir of Samuel Jack probate estate, those funds would become property of her bankruptcy estate and would be subject to distribution to pay claims, thereby making this a proceeding affecting the liquidation of assets of the estate under 28 U.S.C. § 157(b)(2)(O).[5]  Until

---

[4] Under "Description of Property" Judy Jack's Schedule C states: "Deceased husband annuity with Allstate—Allstate is to pay $1,492.78 a month. Settlement Capital has alleged rights to these payments. Debtor believes she is entitled to payments from 2005/2006 until the end of the term of 2012 and Debtor may have other rights in payments before 2005.  Settlement Capital apparently has asserted that all payments go to it.  [T]he [c]laim appears to be [a] claim of the estate of Samuel Jack.  Probate of estate pending in probate court." [Case No. 07-32747, Docket No. 1 at p. 13.]

[5] "[I]f the decedent has died prepetition, and if the debtor is a beneficiary of the decedent's estate or has a claim to be a beneficiary, the debtor's rights become part of the bankruptcy estate even if no probate proceeding has begun or if there has been no order of distribution." David B. Young, *The Intersection of Bankruptcy and Probate*, 49 S. TEX. L. REV. 351, 373 (2007) (citing *Lonstein v. Rockman (In re Lonstein)* 950 F.2d 77, 79-80 (1st Cir. 1991); *Lowe v.*

it is determined whether these funds are property of the estate and whether they are exempt, the Court will not be able to determine whether any plan filed by Judy Jack is feasible and capable of confirmation. Additionally, Violet Jack's involvement in this case is based upon her asserted child support lien which she asserts is superior to any interest that Judy Jack's estate may have in the remaining payments; therefore, this is a core proceeding under 28 U.S.C. § 158(b)(2)(K).[6] Finally, venue is proper pursuant to 28 U.S.C. § 1409(a).

### B.      Samuel Jack's Capacity to Contract

A person does not possess the mental capacity to enter into a contract if he lacks sufficient mind and memory to understand the nature and consequences of the act and the business being transacted. *Mandell & Wright v. Thomas*, 441 S.W. 2d 841, 845 (Tex. 1969) (holding that a party has mental capacity if she "appreciated the effect of what she was doing and understood the nature and consequences of her acts and the business she was transacting") (citing *Missouri-Pacific Ry. Co. v. Brazzil*, 72 Tex. 233, 10 S.W. 403 (1888)). The burden of proof regarding a claim of mental incapacity to contract rests on the party asserting that the person lacked capacity at the time of execution. *Swink v. City of Dallas*, 36 S.W. 2d 222 (Tex. Comm'n App. 1931). "Mental capacity may be evidenced circumstantially by facts that would show: (1) a person's outward conduct, manifesting an inward and causing condition; (2) pre-existing external circumstances tending to produce a special mental condition; and (3) prior or subsequent existence of a mental condition from

---

*Sanflippo (In re Schmidt)*, 362 B.R. 318, 324-35 (Bankr. W.D. Tex. 2007); *In re Benefield*, 102 B.R. 157, 158-59 (Bankr. E.D. Ark. 1989)). Thus, since Samuel Jack died prepetition and Judy Jack is the sole heir of his estate, her interest in his probate estate is property of her Chapter 13 estate.

[6] The Court believes that this is a contract action. Insofar as there are any probate issues intertwined with this proceeding, the Court still has jurisdiction because the Court is not required to determine the validity of Samuel Jack's will in order to fully adjudicate this suit. *Marshall v. Marshall*, 547 U.S. 293, 310-11 (2006).

18

which its existence at the time in question may be inferred." *Bach v. Hudson*, 596 S.W.2d 673, 676

(Tex. Civ. App.—Corpus Christi 1980, no writ) (citations omitted). Since Samuel Jack is deceased,

the Court must make a determination of his mental capacity based on the circumstantial evidence

presented at trial. This process is further complicated by the fact that the subject transactions

occurred more than a dozen years ago.

The Court's analysis breaks down into two components, each of which must be considered

at the time when the transactions occurred: (1) How abstractly should the nature of the transactions

be defined?; and (2) Did Samuel Jack have sufficient memory and mental capacity to understand the

nature and consequences of those actions?

The conclusion of each expert witness was based upon drastically different characterizations

of the SCC transactions. Dr. Borda, on behalf of SCC, broadly described the nature of the SCC

transactions from Samuel Jack's perspective as simply "I will receive money now in exchange for

giving up the right to receive money later." Conversely, Dr. Axelrad relied on a literal description

of the transactions as lengthy, complex contracts full of legalese that even he would not feel

comfortable signing without consulting counsel. Dr. Axelrad's version of the transaction requires

an understanding of the specific details of each individual clause; and Dr. Borda's version is

oversimplified and does not account for all of the foreseeable consequences of the transaction.

The Court believes that the correct answer lies between the two. In order to understand the

transactions, the Court finds that Samuel Jack must have not only understood that he would be

foregoing future monthly payments under the Annuity Contract, but also the relative values of what

he was giving up and what he was receiving. To expand upon Dr. Borda's version of the transaction,

Samuel Jack needed to understand that, "I am receiving X dollars now, for giving up Y dollars in

19

the future." These parameters assure that Samuel Jack knew the general nature of the transaction, but also had an appreciation of the long term impact that it would have on his personal finances and his family. These parameters also do not require a sophisticated level of understanding that he would not have had even if he had suffered no head injury.

Next, the Court considers the mental capacities of Samuel Jack during the period when the transactions occurred. Samuel Jack suffered from three major afflictions: (1) a pre-existing schizoaffective disorder; (2) a right hemisphere organic brain injury caused by the accident; and (3) a comorbid addiction to alcohol which exacerbated his other two conditions. Both expert witnesses agreed that Samuel Jack was impaired by each of these three conditions, but their opinions greatly differed on the severity of his impairments and the relevance of these impairments to his ability to comprehend the subject transactions.

Schizoaffective disorder is a mood disorder which caused Samuel Jack to be depressed. In addition to depression, Samuel Jack exhibited other symptoms including auditory hallucinations, anger control issues, paranoid ideation, suicidal ideation, agitation, and anxiety. In order to address his schizoaffective disorder, Samuel Jack had been prescribed Xanax since 1987 and was later prescribed Haldol. Unfortunately, Samuel Jack was often not compliant in taking his prescriptions. Later, possibly due in part to the lack of monthly income as a result of the SCC transactions, Samuel Jack was unable to afford his medications as prescribed. Dr. Axelrad's testimony discussed Samuel Jack's many instances of erratic behavior as a result of this disorder, which included violence towards Judy Jack and his family. In contrast, Dr. Borda's testimony focused on the positive effects of the medication on Samuel Jack's mood and state of mind. Dr. Borda admitted that this condition, if left untreated or unmedicated, could cause a degree of mental impairment that would justify Dr.

20

Axelrad's conclusion that Samuel Jack lacked capacity to enter into the SCC transactions. However, Dr. Borda noted that when Samuel Jack was regularly taking his prescribed medications, his symptoms were suppressed such that he would not have been impaired.

The Court agrees with Dr. Borda's assessment. However, in order to rule out schizoaffective disorder as a possible source of incapacity, Samuel Jack must have been taking his medication during the relevant time period. Whereas the hospitalization records of December 6, 1995 and October 28, 1996 are focused almost exclusively on alcohol abuse, prior hospitalization records reference Samuel Jack's failure to take his prescribed medication. A February 3, 1995 hospitalization record states that, in addition to consuming excessive amounts of alcohol, Samuel Jack "has been taking Xanax as prescribed, but has been off Haldol, which was prescribed after his last hospitalization." [V. Jack Ex. 16-12.] During his hospital stay, Samuel Jack was taking the correct dosages of all his medication. At the time of discharge, Dr. Axelrad's file notes that Samuel Jack had "gradually decreasing levels of anxiety and depression, decrease in paranoid ideation and improved sleep . . . As seen in the past, this patient had responded quickly to the reduced stress available to him in a hospital setting and modification of his medication." [*Id.*] A similar pattern can be found in Samuel Jack's other records. During a July 1994 hospitalization he was "restarted on previous medications including Xanax and Haldol." [V. Jack Ex. 16-10.] The discharge summary states that "[h]e is stable on his current medication with no other significant health problems." [*Id.*] A January 1994 psychiatric assessment states that Samuel Jack "has not been fully compliant with this medication, often complaining of 'money problems' which has led him to be unable to continue medications regularly on a daily basis. It is possible that his inconsistency with medication has led to exacerbation of current problems." [V. Jack Ex. 16-8.]

Based upon the frequent mentions of non-compliance with medication regimens in prior hospitalization records and the absence of any such reference in the hospitalization records of the relevant time period, the Court concludes that Samuel Jack, during the time period when he entered into the transactions with SCC, was consistently taking medication to treat his schizoaffective disorder, including Xanax and Haldol. Therefore, the Court finds that his pre-existing schizoaffective disorder did not cause him to lack the capacity to contract.

The Court next considers whether the organic brain injury, and accompanying functional impairment, sustained by Samuel Jack during the accident caused him to lack sufficient capacity to enter into the transactions with SCC. Dr. Axelrad testified that Samuel Jack's level of impairment was essentially static because he was unable to afford any kind of rehabilitation program. He also noted that the impairments were worsened by the abuse of alcohol. The right hemisphere of the brain controls several functions that directly bear upon Samuel Jack's ability to understand the transactions with SCC. Throughout his medical records, Samuel Jack reports some memory deficits, including short-term memory which would be necessary to participate in ongoing contractual negotiations. Dr. Axelrad discussed Samuel Jack's cognitive impairments, which included poor executive functions (i.e. the ability to plan and anticipate the consequences of decisions). If Samuel Jack was unable to comprehend the long term consequences of the transactions with SCC, then he would not meet the legal standard for capacity to contract.

Dr. Borda presented a different analysis of Samuel Jack's organic brain injury. Rather than his impairment being static, Dr. Borda described Samuel Jack as being impaired episodically. While there is no question that Samuel Jack sustained some injury, Dr. Borda focused on the agitation caused by his alcohol consumption and failure to take medication. Additionally, Dr. Borda pointed

out that the left hemisphere of the brain, where Samuel Jack had no injury, controlled reading comprehension.  The Court must balance Samuel Jack's unimpaired ability to understand written information against his impaired memory and executive function.

As it did with the schizoaffective disorder, the Court compares Samuel Jack's hospitalization records during the relevant time period with those from prior hospitalizations to determine how his organic brain injury affected him when entering into the transactions with SCC.  On January 28, 1994, prior to the relevant time period, Samuel Jack voluntarily admitted himself to the hospital after suffering intense suicidal ideation. [V. Jack Ex. 16-8.] The psychosocial history update conducted by Dr. Axelrad on this date describes his intellectual functioning as follows: "He cannot think, concentrate or remember.  His judgment is poor.  However, he is alert and oriented to person, place and time." [*Id.*]  Samuel Jack was again hospitalized on May 26, 1994. [V. Jack Ex. 16-9.] The psychosocial history on this date indicates that Samuel Jack reported having "some problems with his memory and feels a little bit confused." [*Id.*]  The psychosocial history prepared on August 8, 1994 states the same condition. [V. Jack Ex. 16-11.]

The medical records related to the hospitalizations which occurred during the relevant time present a more positive view of Samuel Jack's mental impairments. Unfortunately, the December 6, 1995 examination records are unable to provide much assistance in assessing his capacity because he was admitted while still inebriated.  [V. Jack Ex. 16-13.]  The records attribute all of the impairments that he exhibited to his alcoholic consumption. [*Id.*] However, Samuel Jack was sober when admitted on October 28, 1996, the same day that he signed the Amendment.  The mental status examination done on this date indicates that his intellectual functioning was "intact" and that he showed no evidence of memory dysfunction at that time. [V. Jack Ex. 16-14.]  It further states that

23

Samuel Jack's "thought processes are generally intact at this time; there is no evidence of delusions or paranoid ideas of reference. The patient is oriented to time, place, and person." [*Id.*]

Since the Court is focused exclusively on Samuel Jack's capacity during the time period covering the transactions with SCC, the medical reports from those periods must outweigh those describing his condition a year or more before the first transaction. As was the case with schizoaffective disorder, the medical records indicate that the impairments to memory and judgment that Samuel Jack suffered from the accident were less pronounced during the relevant time period.

Finally, the Court addresses the possibility of Samuel Jack's alcoholism causing him to lack sufficient capacity to enter into the transactions with SCC. Even more so than the schizoaffective disorder or his organic brain injury, Samuel Jack's battle with alcoholism was episodic. At one point he reported consuming 12 beers a day and both experts testified that such volume would significantly impair his judgment and memory. When Dr. Borda testified that Samuel Jack's most serious problem during 1995 and 1996 was the alcoholism, counsel for Violet Jack responded by asking whether such consumption would cause him to lack the capacity to enter into the transactions with SCC. Although Dr. Borda responded in the affirmative, the question relies upon an assumption that was not established at trial. There was no evidence adduced through testimony or otherwise that Samuel Jack consumed any amount of alcohol on the dates that he signed any of the PSAs or the Amendment. Accordingly, the Court cannot find that Samuel Jack's alcoholism resulted in his lack of capacity to enter into the transactions with SCC.

In reviewing Samuel Jack's three medical conditions, the Court has consistently favored Dr. Borda's testimony over Dr. Axelrad's despite the fact that it was Dr. Axelrad who personally treated Samuel Jack and created most of the medical records. This decision is justified by the impeachment

of each expert witness during cross examination. Dr. Borda testified on direct examination that he based his expert opinion regarding Samuel Jack's capacity to contract on the Texas test for mental retardation (i.e. an I.Q. below 70) rather than on the standard stipulated by the parties in the pre-trial order and applied in this Memorandum Opinion. On cross examination, counsel for Violet Jack pointed out that the standard applied by Dr. Borda is used only in connection with criminal proceedings and has no relevance to the issue of capacity to contract. *See In re Salazar*, 443 F.3d 430, 432 (5th Cir. 2006); *In re Brown*, 457 F.3d 392, 396 (5th Cir. 2006). Although this was a sizeable error, it was not fatal. On redirect, counsel for SCC successfully rehabilitated Dr. Borda by asking him to test his reading of the medical records against the correct legal standard. Using the same set of facts and inferences derived from the medical records, Dr. Borda convincingly testified that Samuel Jack had sufficient mind and memory to understand the nature and consequences of his transactions with SCC.

Although the impeachment of Dr. Borda went to a vital element of his expert opinion, the wound was relatively superficial. In contrast, the impeachment of Dr. Axelrad cut much deeper. The record contained numerous other legal and quasi-legal documents that Samuel Jack had executed since the accident in 1986. Of these documents, Dr. Axelrad's testimony on cross-examination was that the only ones which Samuel Jack lacked the capacity to execute were the ones related to the transactions with SCC.[7] Most telling among these documents were at least 15 separate forms titled "Consent for the Release of Confidential Information" prepared by the medical practice of Dr. Axelrad and signed by Samuel Jack. [SCC Ex. 16, pp. 5, 6, 7, 8, 9, 10, 11, 12, 13, 529, 520,

---

[7] Dr. Axelrad did testify that he had some doubts about Samuel Jack's ability to understand the Settlement Agreement, but stated that being represented by counsel and a court appointed guardian ad litem obviated the issue of capacity.

531, 545, 546, 547.] These releases range from September 30, 1993 until September 23, 1996, which covers the majority of the relevant time period during which the transactions occurred.

In order to justify accepting Samuel Jack as mentally competent in the context of his own medical practice while simultaneously concluding that he lacked the mental capacity to contract with SCC, Dr. Axelrad relied on a contextual argument—it requires far less ability to comprehend the release of confidential medical information than it does to understand a lengthy, complex legal instrument. While the standard of mental capacity supports such a relative comparison, the argument quickly became a slippery slope for Dr. Axelrad. During his course of treating Samuel Jack in the late 1980s, Dr. Axelrad recommended that Samuel Jack undergo electroshock therapy. Prior to starting this drastic treatment, no attorney, next of kin, guardian, or court was contacted. Rather, Dr. Axelrad testified that he believed that Samuel Jack had sufficient mental capacity to understand the risk of undergoing electroshock therapy. The Court does not believe that the consequences of entering into the transactions with SCC were any more difficult or important than the consequences of undergoing this treatment. Additionally, the Court has already determined, using the contextual position described in *Mandell & Wright v. Thomas*, that the transactions with SCC, from Samuel Jack's perspective, were not as complex as portrayed by Dr. Axelrad. Other persuasive arguments made on cross examination were that Dr. Axelrad never deemed Samuel Jack incompetent to conduct the daily affairs of life; he never recommended an insanity defense to any criminal charges he faced; he never recommended that he be involuntarily committed for a 72-hour hold; and he continued to encourage Samuel Jack to attend Alcoholics Anonymous despite the fact that a person who lacked short-term memory would not be able to comprehend or appreciate the 12 step process.

As a final note, despite the impeachment of both expert witnesses, the Court ultimately made its conclusion of capacity based upon the relevant medical records, which speak for themselves. Thus, despite not giving as much weight to Dr. Axelrad's ultimate conclusion, the Court gave Dr. Axelrad's medical records great weight. Although it may appear that the Court simply followed Dr. Borda's opinion over Dr. Axelrad's, another interpretation of the Court's conclusion is that it gave substantially more weight to Dr. Axelrad's contemporaneous notes instead of his review of those notes more than a decade later.

### C.    Contract for Necessaries

SCC made the alternative argument that even if Samuel Jack lacked capacity, the transactions are still enforceable as a contract for necessaries. "Where the contract is for necessaries, and the consideration is performed, or where the contract is for legal services rendered to the party resting under disability, it seems that the reasonable value therefor may be recovered." *Ferguson v. Fitze*, 173 S.W. 500, 501 (Tex. Civ. App.—Galveston 1914, writ ref'd) (citing *Searcy v. Hunter*, 81 Tex. 644, 17 S.W. 372 (1891)). "The term 'necessaries' is not confined to merely such things as are required for a bare existence, but include those things without which the individual cannot comfortably live, and which are useful and suitable and necessary and proper for his support, use, and comfort in life, taking into consideration the [incapacitated person's] status and condition in life." *Johnson v. Newberry*, 267 S.W. 476, 477 (Tex. Comm'n App. 1924).

Judy Jack did not contest SCC's assertion that the funds acquired by Samuel Jack through the transactions with SCC were used to pay for attorney's fees, restitution, and other legal costs incurred in connection with his DUI offense, as well as the purchase of a new vehicle and the payment of general household expenses. Each of these expenses are deemed necessaries under

Texas case law. *Legler v. Legler*, 189 S.W.2d 505, 512 (Tex. App.—Austin 1945, ref. w.o.m.) (food, clothing, and rent); *Ferguson*, 173 S.W. at 501 (attorney's fees).

In her post-trial brief on this issue, Violet Jack argues that under the case law cited by SCC, a contract for necessaries is only enforceable for the reasonable value received by the incapacitated party. [Docket No. 363.] While this is a correct reading of the above-cited case law, the case at bar is unique in that the direct subject of the contract in question is not any specific necessaries, but rather a lump sum of money which was then used to pay for necessaries. "Money itself is not usually deemed a necessary, since it can as readily be used for improper as for proper purposes." *Johnson*, 267 S.W. at 479. Judy Jack, the only living party with first-hand knowledge of how the funds received by Samuel Jack from SCC were used, testified that all of the funds were used for (1) costs arising in connection with the DUI charge including tickets, restitution and attorney's fees; (2) the purchase of a new vehicle to replace the one destroyed in the accident; and (3) general household expenses including utilities and groceries. Thus, the Court concludes that although money itself is typically not a necessary, the testimony of Judy Jack confirms that all of the funds acquired through the transactions went to the purchase of necessaries. Moreover, there is no evidence that Samuel Jack received less than reasonably equivalent value for any of these purchases.

**D.   Assignability of Samuel Jack's Interest and the Effect of the Anti-alienation Clauses**

### i.   General rules on the assignability of annuity interests

At the conclusion of trial, the Court invited briefing from counsel for SCC and Violet Jack on *Settlement Funding, LLC v. Garcia*, 533 F. Supp. 2d 685 (W.D. Tex. 2006), which held that the annuitant could not assign his rights under an annuity contract because he owned no legal rights in

the annuity contract that were capable of assignment.[8]  The conclusion in *Garcia* was based upon

the fact that the United States, the defendant in the underlying action, was "the owner of the annuity

and [had] the sole right to designate the payee." *Id.* at 694 (citing *Granati v. Stone St. Capital, Inc.*

(*In re Granati*), 307 B.R. 827, 830-31 (E.D. Va. 2002)).  Likewise, Samuel Jack was not a party to

the Annuity Contract and he has no right under the Annuity Contract to designate the payee.  "It is

axiomatic that one may not sell, assign or hypothecate that which he does not own." *Id.* at 691

(citing *Allstate Ins. Co. v. Am. Bankers Ins. Co. of Fla.*, 882 F.2d 856, 859 (4th Cir. 1989)).  Thus,

the Court concludes that Samuel Jack owned no rights under the Annuity Contract which he could

assign to SCC.

However, *Garcia* deals with the limited issue of ownership rights under an annuity and not

the ability to transfer rights under the settlement agreement. *Id.* at 693 ("Based on the pleadings in

this case, the issue for this Court to determine is whether Garcia had any rights to transfer under the

annuity contract not whether Garcia had any rights to transfer under the settlement agreement—a

distinction that is critical.").  *Garcia* positively cited *Western United Assurance Co. v. Hayden*, 64

F.3d 833 (3d Cir. 1995) for the proposition that it is possible to validly assign the right to receive

periodic payments under a settlement agreement.  In *Hayden*, the court also held that since the

annuitant was neither the owner of the annuity nor had the right to change the beneficiary, she could

not assign the right to receive the annuity payments. *Id.* at 837.  However, unlike *Garcia*, the

annuitant in *Hayden* "conveyed her rights under the settlement agreement, including her right to

receive the monthly annuity payments." *Id.* at 835.  Thus, there is a key distinction between an

---

[8] This argument is distinct from the anti-assignment clauses subsequently discussed herein. There was no contractual language precluding an assignment in *Garcia*. Rather, the court was focused on whether the annuitant possessed any transferable interest.

assignment of rights under a settlement agreement and an annuity; the annuitant may transfer the right to receive payments under a settlement agreement, but has no transferrable rights under an annuity.

The Court has carefully reviewed the four PSAs and the Amendment. The First PSA states that Samuel Jack sold SCC all of his rights to the "Annuity Payments," which is a defined term in the contract meaning "such payments [due under the Annuity], together with all of the Seller's rights, titles and interests therein and thereto, including, without limitation, all rights of the Seller to the Annuity Payments pursuant to, based upon, or arising under the Annuity." [SCC Ex. 4.] Thus, the transfer of rights in the First PSA was of the purported rights under the Annuity and not under the Settlement Agreement. Section 3.3 of the First PSA is titled "The Settlement Agreement and the Annuity" and states that "[t]he Settlement Agreement and the Annuity are the only agreements governing or affecting the Annuity Payments or the rights of the Seller to receive the Annuity Payments." There is no language in this section, or any other section of the First PSA, which SCC can rely upon to establish that it was purchasing the right to receive payments under the Settlement Agreement. SCC, who drafted the PSAs, was only purchasing limited rights arising under the Annuity. Indeed, the first three PSAs do not draw any distinction between a right to payment under the Annuity and the Settlement Agreement.[9]

The Amendment does not involve the transfer of any right under either the Annuity or the Settlement Agreement. Instead, the Amendment requires Samuel Jack to simultaneously create a trust which would be funded with "[a]ll payments, benefits, and rights to receive payments pursuant

---

[9] The Second and Third PSAs were prepared on the same form contract as the First PSA and contain verbatim the language discussed above. [SCC Ex. 16 and 18.]

to that certain agreement entitled 'Settlement Agreement and Full Release of All Claims' entered into on or about June 15, 1992 by and between Samuel Jack and Southern Pacific Transportation Company." [SCC Ex. 19 and 21.]  Next, the Amendment states that "concurrently with the creation and funding of the Trust, [Samuel Jack] shall sell, transfer, assign, and convey to [SCC] and [SCC] shall purchase, acquire, and receive all of [Samuel Jack's] beneficial interest in the Trust, for good and valuable consideration received, or to be received by [Samuel Jack]." [SCC Ex. 19.]  Under the terms of the Amendment, SCC did not obtain any rights derived from either the Annuity or the Settlement Agreement.  Rather, it received only Samuel Jack's beneficial interest in the Trust.

After the execution of the Amendment, SCC and Samuel Jack entered into the Fourth PSA, which was prepared using a different form contract than the three previous PSAs.  [SCC Ex. 20.] Where the first three PSAs used the defined term "Annuity Payments," the Fourth PSA uses the term "Settlement Payments," which is defined as Samuel Jack's right to receive payments under the Settlement Agreement.  The Fourth PSA also uses the term "Beneficial Interest" which is defined as all rights to the settlement payments and annuity payments "together with all of [Samuel Jack's] rights, titles and interests therein and there including without limitation all rights of [Samuel Jack] to these payments pursuant to, based upon, or arising under the Trust Agreement, the Settlement Agreement and/or the Annuity and all economic benefits thereunder, and all other rights, title and interests of Seller, whether legal or equitable, in and to the Trust." [*Id.*] It is this beneficial interest which Samuel Jack transferred to SCC in the Fourth PSA.  This final transfer covered the entire remaining period of guaranteed payments (i.e. until June 30, 2012).

By comparing the language used in the first three PSAs with the Amendment and the Fourth PSA, the Court concludes that SCC did not acquire the correct interest under the Settlement

Agreement from Samuel Jack until November 4, 1996. Prior to that time, SCC had only contracted to purchase Samuel Jack's rights under the Annuity, rights which Samuel Jack did not own and could not transfer. This means that (1) SCC should not have received any payments from Allstate until after November 4, 1996; and (2) all payments made before that date rightfully belong to Samuel Jack.[10] SCC received a total of $16,008.41 under the Annuity prior to November 4, 1996.[11] Since these funds should have been paid to Samuel Jack, they must be turned over by SCC to the probate estate of Samuel Jack.[12]

### ii.   The Anti-alienation Clause

Violet and Judy Jack both argued that any transfer that Samuel Jack made to SCC was invalid because both the Settlement Agreement and the Annuity Contract contained anti-alienation provisions. Since the Court determined that the first three PSAs were ineffective attempts by SCC

---

[10] Indeed, after that date SCC should not have received any funds from Allstate, but only from the Samuel Jack 1996 Trust.

[11] Based on the terms contained in the first three PSAs, SCC received the following amounts prior to the execution of the Fourth PSA:

| | |
|---|---|
| 12/1/95 | $ 883.58 |
| 1/1/96 | 883.58 |
| 2/1/96 | 1113.58 |
| 3/1/96 | 1458.63 |
| 4/1/96 | 1458.63 |
| 5/1/96 | 1458.63 |
| 6/1/96 | 1458.63 |
| 7/1/96 | 1458.63 |
| 8/1/96 | 1458.63 |
| 9/1/96 | 1458.63 |
| 10/1/96 | 1458.63 |
| 11/1/96 | 1458.63 |
| Total: | $16,008.41 |

[12] Instead of ordering Allstate to pay all of the monies to SCC, and then ordering SCC to pay $16,008.41 to the probate estate of Samuel Jack, Jr., the Court, for purposes of convenience, orders Allstate to remit all of the funds to SCC except $16,008.41, which the Court orders Allstate to remit to W. Russ Jones, as the successor administrator of the Samuel Jack, Jr. probate estate.

to purchase Samuel Jack's rights under the Annuity Contract, the anti-alienation provision in Annuity Contract is irrelevant.   Since the only valid transfer was of rights derived from the Settlement Agreement, the Court focuses only on the anti-alienation provision in the Settlement Agreement, which states, "I acknowledge that the periodic payments cannot be accelerated, deferred, increased or decreased by me or any payee; nor shall I or any payee have the power to sell, mortgage, encumber, or anticipate the periodic payments, or any part thereof, by assignment or otherwise." [SCC Ex. 3, p. 4.]

SCC asserts that Samuel Jack waived the protection of this provision based upon the following clause in the Fourth PSA, which is entitled "Waiver of Restrictions":

> To the extent that any restrictions on the assignability of the Periodic Payments were included in the Settlement Agreement or the Annuity for the benefit of Seller, Seller acknowledges his intent to waive said benefits.  Seller acknowledges that all income realized by Seller after Closing upon any investment or use of the Purchase Price, unless excludable under a provision of the [Internal Revenue Code] may be included in the gross income of Seller under the Code and that this transaction may result in an acceleration and increase in the amount of federal and state income taxes required to be paid by Seller.  For the benefit of Purchaser, Purchaser's assigns, the Annuity Issuer and on behalf of Seller and Seller's heirs, beneficiaries, executors, administrators, and legal representatives, Seller hereby WAIVES AND RELEASES all rights and benefits of Seller in, to, or under, all such restrictions on assignability, if any.

[SCC Ex. 20, § 6.1 (emphasis in original).]

The Fourth PSA also includes the following language in a section entitled "Indemnification":

> Seller acknowledges that the Settlement Agreement or the Annuity, or both, may contain provisions that restrict or purport to restrict the assignability of the Periodic Payments and/or the Beneficial Interest.  Seller further acknowledges that Seller has (both for Seller and for Seller's heirs, executors, administrators, representatives, successors and assigns): (i) released Purchaser from (and waived) any claim that the Beneficial Interest was not assignable; (ii) indemnified and agreed to hold Purchaser harmless from (and agreed to defend Purchaser in any subsequent lawsuit with respect to) any claim that the Beneficial Interest was not assignable; and (iii) agreed never to

sue Purchaser with respect to the transferability or assignability of the Beneficial Interest. Without in any way limiting the scope or application of any other provision of this Agreement or the other Closing Documents (and in addition to all of the other covenants and agreements of Seller in this Agreement and the other Closing Documents), Seller covenants and agrees to so order and conduct Seller's affairs as to prevent the assertion of any claim that the Beneficial Interest were not assignable.

[SCC Ex. 20, § 8.2.]

In order to ensure waiver by not just Samuel Jack, but also by his heirs or assigns, SCC also required Judy Jack to execute a Spousal Consent in conjunction with each of the PSAs.[13] The Fourth Spousal Consent that Judy Jack signed states:

The undersigned hereby agrees and consents to Seller's execution and delivery of the Purchase Agreement and all of the Closing Documents, and to the consummation of the transactions contemplated thereby, specifically including, without limitation, the sale and transfer by Seller to Purchase of the Beneficial Interest.

The undersigned agrees to be subject to the terms and provision of the Purchase Agreement and each of the Closing Documents (as fully as if the undersigned executed and acknowledged each and every one) and hereby waives any and all right, title, and interest of the undersign in, to, or under the Beneficial Interest, specifically including, without limitation, any community property interest.

[SCC. Ex. 25.]

In *Hayden*, the settlement agreement did not contain express language prohibiting the assignment of any rights. Instead, the Haydens argued that there was an implied restriction on alienation based upon the negative tax consequences of an assignment under I.R.C. § 130, and that an anti-assignment clause in the annuity should be read to apply to the settlement agreement as well. *Hayden*, 64 F.3d at 841-42. The Third Circuit rejected both arguments. Unlike *Hayden*, the

---

[13] Judy Jack testified that she did not read this document or any of the PSAs, but signed the Spousal Consent forms out of what she felt was the obligation to be a good wife and comply with her husband's wishes, particularly because the accident and settlement occurred prior to their marriage. Unfortunately, such an argument does not present a valid legal defense to the enforceability of a contract. *In re Media Arts Group, Inc.*, 116 S.W.3d 900, 908 ("[U]nder Texas law, a person is obligated to protect himself by reading what he signs and, absent fraud, may not excuse himself from the consequences of failing to meet that obligation.").

Settlement Agreement in this suit does contain an explicit anti-alienation provision. [*See* SCC Ex. 3, p. 4.] Thus, Samuel Jack would only have had the power to assign his rights under the Settlement Agreement to SCC if the waiver contained in the Fourth PSA is valid and enforceable.

The Court draws upon the analysis in *Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711 (Tex. App.—Dallas 2004, no pet.), which is both factually and legally similar to this suit. Mr. Johnson sustained a personal injury and settled his claims for a lump sum payment and future structured settlement payments. The settlement agreement in *Johnson* stated that the future payments "cannot be accelerated, deferred, increased, or decreased" by Mr. Johnson and that he does not "have the power to sell or mortgage or encumber same, or in any part thereof, nor anticipate the same, or any part hereof by assignment or otherwise." *Id.* at 716. This anti-assignment language is nearly identical to the Settlement Agreement. After encountering some economic difficulties, Johnson entered into an agreement with a factoring company to receive a lump sum payment in exchange for his future stream of payments. *Id.* at 717. Approximately one year after entering into that purchase agreement, Johnson, perhaps out of buyer's remorse, ordered the annuity company to redirect the payments from the factoring company back to him. *Id.* Eventually the annuity company interpleaded the annuity funds and the court had to decide whether Mr. Johnson or the factoring company owned the payments. *Id.* at 718.

*Johnson* noted that "[a]nti-assignment clauses are enforceable unless rendered ineffective by statute [and i]n the absence of a successful attack upon an anti-assignment clause, a party is entitled to have the trial court enforce it." *Id.* at 721 (citations omitted). The court addressed in detail two of the attacks made by Mr. Johnson on the anti-assignment clause based upon principles of contract law: waiver and public policy.

35

Regarding waiver of an anti-assignment provision, *Johnson* states:

> In order to establish a waiver of rights under a contract, there must be proof of an intent to relinquish a known right. *Huffington v. Upchurch*, 532 S.W.2d 576, 580, 19 Tex. Sup. Ct. J. 138 (Tex. 1976); *see also Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 750 (Tex. App.—Corpus Christi 1986, no writ). A party's express renunciation of a known right can establish a waiver. *Tenneco, Inc. v. Enterprise Products, Company*, 925 S.W.2d 640, 643, 39 Tex. Sup. Ct. J. 907 (Tex. 1996); *see also Texas Development Co. v. ExxonMobil Corp.*, 119 S.W.3d 875, 884 (Tex. App.—Eastland 2003, no writ). A party's silence or inaction for a period of time long enough to show an intention to yield the known right, is also enough to prove a waiver. *Tenneco, Inc.*, 925 S.W.2d at 643; *see also Texas Development Co.*, 119 S.W.3d at 884. An anti-assignment clause can be waived and the laws governing the waiver of contractual rights apply. *See generally Texas Development Co.*, 119 S.W.3d at 884; *University of Texas Medical Branch at Galveston v. Allan*, 777 S.W.2d 450, 453 (Tex. App.—Houston [14th Dist.] 1989, no writ).

*Johnson*, 148 S.W.3d at 722.

The agreement that Mr. Johnson entered into with the factoring company contained a waiver of the anti-assignment provision that is extremely similar to the one in the Fourth PSA. Both clauses are conspicuous. Each clause contains the word "waiver" in the section heading and the phrase "waives and releases" appears in all capital letters in the main text. Additionally, the Settlement Agreement contains the indemnification provision which reiterates that Samuel Jack had agreed to waive the protections of the anti-assignment clause. The court in *Johnson* went on to note that Mr. Johnson's intent to waive the anti-assignment provision could be implied from his failure to object to the factoring company receiving the annuity payments for eleven months. *Id.* at 724-25; *see also In re Terry*, 245 B.R. 422, 426 (Bankr. N.D. Ga. 2000) ("For all intents and purposes, the Debtor ignored [the anti-assignment clause] by executing the Purchase Agreement (presumably because he deemed it to be in his best interest to do so). Now, almost two years later, and because he needs money to fund his Chapter 13 plan, the Debtor seeks to revive and attach meaning to the Settlement

36

Agreement's anti-assignment provision. The Debtor's attempt to reverse the Wentworth transaction is both disingenuous and not supported by applicable law.").

This logic is even more persuasive in the suit at bar. Samuel Jack never made any attempt to enforce the anti-assignment clause in the Settlement Agreement. From 1995, when he entered into the first transaction with SCC, until his death in 2004, Samuel Jack was apparently content with the outcome of the transactions, or, at a minimum, he took no legal action seeking to rescind them. It was not until after his death that Judy and Violet Jack sought enforcement of the anti-assignment clause. Judy Jack enjoyed the benefits of the transactions with SCC in the same way that Samuel Jack did until his death. Moreover, aside from her silence regarding the anti-assignment clause, Judy Jack also executed the Spousal Consent in which she agreed to the transaction and waived any rights she may have had to claim an interest in the Annuity payments.

Based upon the similarities between the waiver in the Fourth PSA and the one upheld by *Johnson*, this Court concludes that Samuel Jack effectively waived the protection of the anti-assignment clause in the Settlement Agreement. Even in the absence of such an express waiver, Samuel Jack impliedly waived protection of the anti-assignment clause by retaining the benefit of the transactions and failing to seek enforcement of the anti-assignment clause. The Court also concludes that Judy Jack waived any rights she may have had under the anti-assignment clause by signing the Spousal Consent.

Mr. Johnson also argued that the purchase of his future settlement payments violated the public policy of Texas as embodied in the Structured Settlement Protection Act. In both *Johnson* and the suit at bar, the transactions were not covered by this Act because they were entered into prior to the Act's effective date of September 1, 2001. Tex. Civ. Prac. & Rem. Code §§ 141.001-141.007

(Vernon 2007); *Johnson*, 148 S.W.3d at 727. The court in *Johnson* held that the Structured Settlement Protection Act was "a paternalistic statute: it requires disclosure and court approval before any transfer of structured settlement payment rights." *Id.* at 729. After a thorough review of federal and state court opinions on the public policy surrounding the transfer of structured settlement payments, *Johnson* concludes that "[w]e agree with the majority of courts that the assignment of structured settlement payments is not against public policy. As a result, we conclude that Johnson's transfer of his right to receive structured settlement payments was not against any legislatively created public policy or prohibited by the decisions of the Texas courts." *Id.* at 731 (citing *Wolfe v. C.S.P.H., Inc.*, 24 S.W.3d 641, 645 (Tex. App.—Dallas 2000, no pet.)). This Court adopts the holding in *Johnson* regarding Texas' public policy on the transfer of structured settlement payments and concludes that the Fourth PSA does not violate public policy.

The same court that decided *Johnson* issued an opinion several years later in another factually similar case. *Coffey v. Singer Asset Fin. Co., LLC*, 223 S.W.3d 559 (Tex. App.—Dallas 2007, no pet.). *Coffey* involved a pledge of future payments as collateral rather than an assignment, but the anti-alienation provision also prohibited such a pledge. One of the appellants in *Coffey* did not expressly waive the protections of the anti-assignment clause. She did, however, "voluntarily sign[] the loan agreements and accept[] the lump sum payment Settlement Capital offered in exchange for a security interest in those payments three times." *Id.* at 569.[14] "[E]stoppel by contract will not permit a party to a contract to take a position inconsistent with the contract's provisions to the prejudice of another." *Id.* Based upon her lengthy delay in seeking to enforce the anti-assignment provision, the court concluded that she was estopped from asserting the anti-assignment clause. *Id.*

[14] The Settlement Capital referred to in *Coffey* is the same entity as SCC in the suit at bar.

Like the appellant in *Coffey*, Judy Jack waited more than two years after Samuel Jack's death, and more than 10 years after the Fourth PSA and the final Spousal Consent were executed, until she first raised the issue of the anti-assignment clause. And, like the debtor in *Terry*, Judy Jack claimed no interest in the remaining annuity payments until she filed her schedules in the underlying Chapter 13 case. Thus, the Court concludes that, in addition to waiving its protection by signing the Spousal Consent, Judy Jack is also estopped from asserting the anti-alienation provision in the Settlement Agreement.

In sum, the Court holds that the first three PSAs were not valid because SCC sought to purchase rights from Samuel Jack which he did not own under the Annuity Contract. However, the Amendment and the Fourth PSA correctly transfer Samuel Jack's interests under the Settlement Agreement to SCC. Moreover, although the anti-assignment clause contained in the Settlement Agreement is valid, Judy and Samuel Jack both waived their right to enforce such a provision by signing the Fourth PSA and Spousal Consent, respectively. Finally, Judy and Samuel Jack are estopped from enforcing the anti-assignment provision because they retained the benefits of the transactions for more than a decade before Judy Jack first raised the issue. This means that SCC, through its interest in the Samuel Jack 1996 Trust, is the rightful owner of the remaining annuity payments and has been such since November 4, 1996, when Samuel Jack executed the Fourth PSA.

E.     **Violet Jack's Child Support Lien**

Finally, the Court must address that status of Violet Jack's child support lien which she claims is attached to the remaining payments. The Texas Family Code provides that:

> A lien attaches to all property owned or acquired on or after the date the lien notice or abstract of judgment is filed with the county clerk of the county in which the property is located, with the court clerk as to property or claims in litigation, or, as

to property of the obligation in possession or control of a third party, from the date
the lien notice is delivered to that party.

TEX. FAM. CODE ANN. § 157.317(a-1) (Vernon 2007).

This statute plainly states that a child support lien only attaches to property that is owned by
the obligor on the date that notice of that lien is either delivered directly to the holder of that property
or when an abstract is filed with the county clerk. Moreover, at least one Texas Court of Appeals
has held that, based upon this statute, a child support lien does not create any interest in personal
property that was conveyed before the lien was recorded. *Schumann v. Breedlove & Bensey*, 983
S.W.2d 333 (Tex. App.—Houston [1st Dist.] 1998, no writ). In *Schumann*, the father assigned away
proceeds from a lawsuit settlement in 1994. The mother did not record a notice of child support lien
in the county clerk until 1997. The court held that the husband no longer owned any interest in the
proceeds on the date that the child support lien was filed . Accordingly, pursuant to Family Code
§ 157.317(a), the property was not "property of the obligor" as soon as the assignment occurred and
the lien could not attach to those proceeds three years later.

Violet Jack did not obtain her child support lien until 2004. Since the Court has concluded
that all of Samuel Jack's interest in the Annuity Contract and Settlement Agreement was validly
assigned to SCC as of November 4, 1996, her lien could not attach to the remaining payments
because they belonged to SCC and not Samuel Jack in 2004. The Court also concluded that Judy
Jack's Chapter 13 estate, through Samuel Jack's probate estate, is entitled to a return of the
approximately $16,000 in payments that SCC received prior to November 4, 1996. Although the
return of these funds will occur in 2008, Violet Jack's interest does not attach to them because they
are, in actuality, funds from 1996, before Violet Jack had filed for her child support lien.

The final issue related to Violet Jack is her receipt of five annuity payments between August 2004 and January 2005 totaling $7,363.15. At the time she received these funds, Samuel Jack had conveyed away all of his rights to the payments. SCC should have received these payments from Allstate through its interest in the Samuel Jack 1996 Trust. SCC's First Amended Complaint only seeks declaratory relief that Samuel Jack conveyed all of his interest in the Trust to SCC and that SCC has the exclusive right, through the Trust, to the remaining payments. However, SCC does not specifically request recovery of the $7,363.15 from either Allstate or Violet Jack. Accordingly, the Court will grant only the declaratory relief sought by SCC. Since neither Violet Jack nor Allstate are debtors before this Court, SCC may pursue the recovery of these funds in the appropriate state court.

## V.    Conclusion

To review, Samuel Jack did have sufficient mental capacity to enter into the transactions with SCC between November 1995 and November 1996. The first three PSAs purport to convey to SCC an interest under the Annuity Contract that Samuel Jack did not have the legal ability to transfer. However, Samuel Jack conveyed all of his rights under the Settlement Agreement to the Samuel Jack 1996 and the Amendment and Fourth PSA conveyed his entire beneficial interest in the Trust to SCC. Therefore, SCC, through the Trust, is entitled to the remaining payments due under the Annuity. Additionally, since SCC did not acquire this interest until November 4, 1996, it should not have received the $16,008.41 in payments made by Allstate prior to that date. Those payments should have been directed to Samuel Jack and currently belong to his probate estate; therefore, the funds should in the first instance now be remitted to the executor of Samuel Jack's probate estate. Then, because Judy Jack is the sole heir of the probate estate, the executor should deliver those funds

41

to the Chapter 13 Trustee for distribution to her creditors.  Finally, Violet Jack's lien does not attach to these funds because Samuel Jack's interest to these funds dates back to 1996, eight years before she recorded her child support lien.

Signed on this 10th day of July 2008.

Jeff Bohm
U.S. Bankruptcy Judge

42